**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X
                                 :

In re                                   :

                                 :       Chapter 11

DiNaso & Sons Building Supply Company, Inc.   :

                                 :       Case No. 14-42298 (CEC)

      Debtor.                     :
------------------------------------------------------------X

**MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 105 AND 363**
**OF THE BANKRUPTCY CODE APPROVING (A) AGREEMENT OF SALE WITH**
**STALKING HORSE BIDDER, (B) BID AND SALE PROCEDURES, (C) MANNER AND**
**FORM OF NOTICE, AND (D) AUCTION DATE IN CONNECTION**
**WITH SALE OF DEBTOR'S REAL PROPERTY**

DiNaso & Sons Building Supply, Inc., the above debtor and debtor in possession (the "Debtor"), by its attorneys, Rash & Bakshi, as and for its motion (the "Motion")[1], pursuant to Sections 105 and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq</u>. (the "Bankruptcy Code"), for entry of an Order approving (a) the Agreement of Sale (the "Agreement") with the Stalking Horse Bidder, (b) Bid Procedures, (b) manner and form of notice and (c) the date for the auction (the "Auction"), to be utilized in connection with a sale of the Debtor's real property located at 133 Ocean Avenue, Lakewood, New Jersey (the "Real Property"), and granting such other and further relief to which it may be entitled, the Debtor respectfully represents as follows:

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Bid Procedures and/or the Agreement.

## JURISDICTION AND STATUTORY PREDICATES

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105 and 363 of the Bankruptcy Code, and Bankruptcy Rules 6004.

## BACKGROUND

2.      On 7 May 2014 (the "Petition Date), the Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court for the Eastern District of New York (the "Court").

3.      The Debtor has continued in the management of its business and the operation of its affairs and property as a debtor and debtor in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code.

4.      The Debtor owns the Real Property in fee simple. The Debtor operated a building supply from the location, but shuttered that location more than a year ago. This Chapter 11 case was precipitated by the Debtor's loss of its credit facility, the economic difficulties given the overall recent and current economic climate in this region, and the high outstanding debt owed to its first priority secured creditor, Santander Bank, ("Santander"), based upon certain asserted defaults, as of the Filing Date, which total debt likely exceeds $13,209,621 for the Debtor and all affiliated entities.[2]

---

[2] The total principal owed to Santander as of the Filing Date is approximately $13,209,621. Without prejudice, with default interest, as of the Filing Date, the total sum owed to Santander by the Debtor likely exceeds $13,209,621.

5.      Included with the outstanding liabilities of the Debtor is a secured affiliated loan from Victory State Bank.

6.      The Debtor has given due direction to proceed with the potential sale of the Debtor's Real Property for the benefit of the Debtor's estate and its creditors.

7.      No Trustee or Examiner has been appointed, and no Official Committee of Unsecured Creditors has been formed in this case.

## RELIEF
## REQUESTED

8.      On 15 May 2014, the Debtor and the Stalking Horse Bidder, Marcel Katz, entered into the Agreement for the sale of the Real Property, subject to higher or better offers, for the Purchase Price of $2,400,000.00. A copy of the Agreement is annexed as **Exhibit "A"**.

9.      By this Motion, the Debtor seeks the entry of an Order of this Court upon a hearing in connection herewith, approving the Agreement with the Stalking Horse Bidder, and establishing certain deadlines, procedures and notice requirements related to a prospective sale  (potentially through the Auction) of the Debtor's Real Property (a "Bid Procedures Order").

10.      Subsequent to the Auction, the Debtor will advise the Court at a hearing to be  scheduled by the Bid Procedures Order of the results of the Auction (or desire to consummate a  private sale with the Stalking Horse Bidder if no auction is held).  However, the Auction will not produce  sufficient proceeds with which to satisfy Santander's lien against the Real Property.[3]

### BASIS FOR RELIEF

11.    The Debtor has worked toward the sale of the Real Property as a way to maximize the Debtor's assets for the benefit of the Debtor's estate and creditors.

12.    The Debtor, through the efforts of Key Realty ("Key") as its duly retained real estate broker, prior to filing Bankruptcy and now subject to be retained upon approval of a motion to employ professional, and in consultation with Santander, has been actively marketing the Real Property for potential sale.

13.    The Debtor proposes the following process for the sale of the Debtor's Real Property.

### A.  Sale of Real Property Pursuant to Auction

14.    In accordance with Bankruptcy Rule 6004(f)(1), the sale of property outside of the ordinary course of business may be by private sale or by public auction.  See *Fed. R. Bankr. P.* 6004(f)(1). The sale of the Real Property via the Auction (with a reservation of rights to reject any bid deemed to be unqualified) pursuant to the Bid Procedures, or to proceed with a private sale to the Stalking Horse Bidder if no Auction occurs, will enable the Debtor to obtain the highest or best offer for the Real Property, thus, maximizing the value of the estate. Accordingly, the Auction, or a private sale, is the proposed methodology that serves the best interests of the Debtor, its creditors, and other parties-in-interest in this case.

15.    The marketing program utilized by the Debtor, through Key and in consultation with Santander together with the notice requirements set forth in the Proposed Bid Procedures

---

[3]  Even in the event of a private sale to the Stalking Horse Bidder for the Purchase Price as set forth in the Agreement if no Auction is held, the sale may be effectuated under Section 363 of the Bankruptcy Code so long

as   Santander consents to such sale.

Order are sufficient to provide adequate notice to interested purchasers of the sale of the Real Property. The Debtor has identified interested parties and potential purchasers (the "Potential Purchasers") and has provided such Potential Purchasers with pertinent documents upon their request in connection with the marketing and potential sale of the Real Property[4]. In an attempt to maximize the value of the asset for the benefit of the Debtor's estate and its creditors, The Debtor will continue to market the Real Property seeking higher  or better offers through the Bid Deadline.

### B.  Proposed Bid Procedures[5]

16.    The Debtor proposes to follow the Bid Procedures (the "Bid Procedures"), attached to the Proposed Bid Procedures Order as **Exhibit "A"**, and to conduct the Auction on **June 17, 2014 at 11:00 a.m. (Eastern Standard Time)** at the offices of Debtor at 133 Ocean Avenue, Lakewood, New Jersey, with all rights  reserved as set forth herein and in any Order entered by the Court.

---

[4]    The following description of the Bid Procedures is a summary of the terms of the Bid Procedures. Capitalized terms used herein have the meanings ascribed to them in the Bid Procedures and/or the Agreement. To the extent that the summary differs in any way from the terms set forth in the Bid Procedures, the Bid Procedures shall control.

17.     To participate in the Auction, the Debtor proposes that all interested parties comply with the Bid Procedures, including the requirement that all written bids be submitted no later than **June 15, 2013 at 5:00 PM (Eastern Standard Time)** to the parties set forth herein.

18.     Bidders are cautioned that, as set forth in the Bid Procedures, in the event of a failure to consummate a sale of the Real Property because of a breach or failure on the part of the Successful Bidder (as defined in the Bid Procedures) with respect to the Real Property, the Debtor is requesting authority to, and shall, retain the Successful Bidder's deposit as liquidated damages, and the next highest or otherwise best qualified bidder (the Backup Bidder), as disclosed at the hearing with respect to the Real Property, shall be deemed the Successful Bidder and shall consummate the sale of the Real Property, without adjustment for the retained deposit of the failed successful bidder, without further order of the Court.  Additionally, as set forth in the Agreement, in the event that no Auction occurs, the Debtor will proceed to consummate the private sale of the Real Property with the Stalking Horse Bidder[6].

**C.  Proposed Sale of the Real Property Free and Clear of Liens Section 363(b)**

19.     Section 363(b) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In addition, § 105(a) of the Bankruptcy Code

---

[5] Notwithstanding anything stated herein to the contrary, the Debtor reserves its rights, if applicable based upon the specific circumstances of this case, to seek authority for the sale of the Real Property to be effectuated pursuant to a Chapter 11 Plan, although at this time such a prospect is highly unlikely.

provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a).

20.    The proposed use, sale, or lease of property of the estate may be approved under §363(b) of the Bankruptcy Code if it is supported by sound business justification. See In re Lionel Corp., 722 F.2d 1063, 107071 (2d Cir. 1983); In re Ionosphere Clubs, Inc., 184 B.R. 648 (S.D.N.Y. 1995); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991). Moreover, pursuant to § 105, the Court has expansive equitable powers to fashion any order or decree which is in the interest of preserving or protecting the value of the Debtor's assets. See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986).

21.    In Lionel, one of the seminal and most widely followed cases dealing with asset sales, the Second Circuit determined that a sale of assets could be approved if the debtor could demonstrate an "articulated business justification" for the sale. 722 F.2d at 1070. The Court further held that the factors to be considered in determining whether a sound business reason exists include the following:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, *most importantly perhaps, whether the asset is increasing or decreasing in value.*

Id. at 1071 (emphasis supplied).

22.     If a sound business justification exists, then a presumption attaches that the decision was informed, in good faith and in the honest belief that the action was in the best interests of the estate.  In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).

23.     In addition to requiring sound business reasons to approve a sale pursuant to section 363(b) of the Bankruptcy Code, many courts have required a showing that the price to be obtained for assets be fair and reasonable; that the sale to the proposed purchaser was negotiated in good faith; and that it does not unfairly benefit insiders, the purchaser, or a certain creditor or class of creditors. See, e.g., In re Channel One Communications, 117 B.R. at 494-97; In re Indus. Valley Refrig. & Air Cond. Supplies, Inc., 77 B.R. 15 (Bankr. E.D. Pa. 1987).

24.     Moreover, the Bankruptcy Court need not wait until confirmation of a plan to approve a disposition of a substantial portion of a debtor's assets if there is a possibility that the debtor will lose a lucrative business opportunity or risk serious harm to the debtor or its assets. In re Chateaugay Corp., 973 F.2d 141; Lionel, 722 F.2d at 1063; In re St. Petersburg Hotel Assoc., Ltd., 37 B.R. 341 (Bank. M.D. Fla. 1984).

### Section 363(f)

25.     The Debtor further requests authority to sell the Real Property free and clear of any and all liens, interests, claims, and encumbrances which may be asserted. Such liens, interests, claims and encumbrances will attach to the net proceeds received by the Debtor as a result of the sale with the same priority, validity, force and effect as they currently exist. Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of third-party interests only if (1) applicable nonbankruptcy law permits it, (2) the third party consents, (3) the interest is a lien and the purchase price is greater than the aggregate value of all liens on the

equitably compelled to accept a money satisfaction of that interest. Since Section 363(f) of the Bankruptcy Code is written in the disjunctive, any of the five conditions, provides authority to sell free and clear of liens. See In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988). Here, the Debtor submits, depending upon the outcome of the Auction, that it will demonstrate to the Court that one or more requirements under Section 363(f) are satisfied.

26. There are compelling reasons and sound business justifications for the Court to authorize the sale of the Real Property as proposed herein. As discussed more fully herein, the Real Property has been prudently and skillfully marketed to a myriad of potentially interested parties and purchasers in an attempt to capture the greatest possible value for the estate. Most significantly, as a result of the marketing process, the Debtor entered the Agreement with the Stalking Horse Bidder.

27. At this juncture, the Debtor, in the exercise of its reasonable business judgment, has concluded that the sale of the Real Property, pursuant to the proposed Bid Procedures, is likely to produce the highest or best offer that could reasonably be obtained for the Real Property. The Debtor further believes that the Auction sale of the Real Property in accordance with the terms of the proposed form of order submitted herewith is in the best interests of the Debtor, its estate and creditors.

28. Approval of the Auction of the Real Property at this point in the Debtor's case is necessary to attempt to maximize the value of the asset to the estate. In this regard, the Debtor risks the lost opportunity if the Auction and/or private sale is not conducted, to the detriment of the Debtor's estate and its creditors.

**B. Bid Protections**

29.     Subject to Court approval, as set forth in the Agreement, the Debtor requests this Court approve an expense reimbursement of up to $35,000.00 (the "Reimbursement Fee") to the Stalking Horse Bidder, should a competing offer (not from the Stalking Horse Bidder) be consummated by the Debtor. As more fully set forth in the Agreement, the Reimbursement Fee is not to exceed the aforementioned sum, and is to be paid only from the proceeds of a higher sale to a Successful Bidder, with proof of such actual expenses having been paid by the Stalking Horse Bidder to be submitted to the Debtor following the Closing.

30.     Bankruptcy Courts in this district are guided by the principles of the "business judgment" rule in evaluating a debtor's decision to offer bidding protections.    See In re Integrated Resources, Inc., 147 B.R. 650, 658 (S.D.N.Y. 1992) ("A bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-, length negotiations.") (citation omitted). Bidding protections for purchasers of Chapter 11 debtors and/or their assets constitute appropriate compensation for the risk and expense involved in preparing and proposing a bid, which thereby enhances the value of the debtor's estate by attracting initial bids and establishing a minimum standard for competing bids. Bidding protections may take many different forms, including paying the out-of-pocket expenses incurred by a bidder in arranging the deal, including due diligence expenses, or compensating a bidder for its lost opportunity costs. See In re Hupp Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992). A break-up fee should be "reasonably related to the bidder's efforts and the transaction's magnitude." Integrated Resources, 147 B.R. at 662-63.

31.     Here, the Reimbursement Fee represents approximately 1.5% of the Purchase Price (up to $35,000.00), and is wholly reasonable based upon the time, energy and expenses

undertaken by the Stalking Horse Bidder in making its offer and entering the Agreement. The Debtor respectfully submits that payment of the Reimbursement Fee is reasonable and should be approved by this Court.

## NOTICE

32.    Notice of this Motion will be given as set forth in the Order Scheduling Hearing. The Debtor submits that such notice is appropriate and sufficient, and that no other notice need be given.

33.    The Debtor submits that this Motion cites the relevant statutory and other authority and rules for the relief requested, and that this Motion complies with Local Bankruptcy Rule 9013-1(a). Therefore, no separate memorandum of law is required in connection with this Motion.

34.    No prior application for the relief requested herein has been made to this or any other court.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an Order approving: (a) the Agreement with the Stalking Horse Bidder; (b) the Bid Procedures, (c) the manner and form of notice to be utilized in connection with the sale of the Debtor's Real Property, and (d) the date for the Auction, and granting related relief, and such other and further relief as is just and proper.

Dated:  New York, New York          **Rash & Bakshi**
         May 15, 2014               Attorneys for Debtor

                                    By:    /s/ Moneesh Bakshi
                                           Moneesh Bakshi, Esq.
                                           A Partner of the Firm
                                           46 Rockefeller Plaza
                                           Suite 2000
                                           New York, New York 10111
                                           (646) 583-1615

EXHIBIT "A"

# PROPOSED AGREEMENT OF SALE

AGREEMENT made as of this ___ day of 2013, between DiNaso Building Supply Co, Inc. (the "Debtor") having an address at 133 Ocean Avenue, Lakewood, New Jersey 08701 and Marcel Katz, or his designee ("Purchaser"), having an address at _____. (the "Agreement").

WHEREAS, Debtor is the record owner of the premises located at 133 Ocean Avenue, Lakewood, New Jersey, Lots 65 and 66, Block 248.01, Township of Lakewood, New Jersey as more fully described in the annexed Schedule "A" (the "Premises").

WHEREAS, Purchaser desires to purchase the Premises and the personal property (the "Personal Property") listed on Schedule "B" from the Debtor who desires to sell the Premises and the Personal Property to Purchaser, in accordance with the terms, covenants and conditions set forth in this Agreement, subject to and contingent upon entry of an appropriate Order of the Bankruptcy Court, under Case No. 14-42298 (CEC) (the "Bankruptcy Case") pending in the Bankruptcy Court for the Eastern District of New York (the "Court") that authorizes Debtor's sale of the Premises and Personal Property free and clear of all liens, claims, taxes and encumbrances of whatever kind or nature, other than the Permitted Encumbrances (as hereinafter . defined), with any such liens, claims, taxes and encumbrances to attach to the proceeds of the sale in the order of priority of such liens, claims, taxes and encumbrances (the "Approval Order").

NOW, THEREFORE, in consideration of the terms, covenants and conditions as hereinafter set forth, the parties agree as follows:

## 1.    Agreement to Sell and Purchase

(a).    Debtor agrees to sell, convey and assign the right, title and interest in and to the Premises and Personal Property to Purchaser and Purchaser agrees to purchase, accept and assume such title no later than ten (10) days following the date of entry of the Approval Order granting Purchaser §363(m) protection under the Bankruptcy Code (the "Closing Date"). The term "Final Order" means an Order or judgment of the Court, entered on its docket that (a) has not been reversed, stayed, modified, or amended and as to which the time to appeal from, or to seek review or rehearing of, has expired and as to which no appeal or petition for review, rehearing or certiorari is pending, or (b) if appealed from, has been affirmed (or the appeal dismissed) and the time to further appeal, seek review or a rehearing has expired or no further hearing, appeal or petition for certiorari can be taken or granted. The sale of the Premises and Personal Property may be subject to a plan and disclosure statement if applicable in the Bankruptcy Case.

1

(b).    Time is of the essence for Purchaser to perform all of the obligations required on its part to be performed under this Agreement by the Closing Date. Purchaser has a one-time right to extend the Closing Date for 20 days.

(c)    The sale of the Premises includes all right, title and interest, if any, in and to any land lying in the bed of any street, road or avenue opened or proposed, in front of or adjoining the Premises, to the center line thereof, and all right, title and interest of Debtor in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to the Premises by reason of change of the grade of any street and to any books and records as to the leases of the Premises. Debtor will execute and deliver to Purchaser, at the closing of title hereunder (the "Closing"), or thereafter, on demand, all proper instruments for the conveyance of such title that the Title Company (as hereinafter defined) will insure at standard rates, without additional premium and the assignment and collection of any such award.

## 2.    Amount and Manner of Payment of Purchase Price

Purchaser agrees to pay $2,400,000.00 (Two Million Four Hundred Thousand Dollars) to the Debtor for the acquisition of the Premises (the "Purchase Price") subject only to such prorations and/or closing adjustments that are provided for under this Agreement. Purchaser will pay the Purchase Price to the Debtor as follows: $10,000.00 initially, plus $90,000 (the "Down Payment") on signing of this Agreement, by check subject to collection, payable to _____ as Attorneys, to be held in an interest bearing escrow account pursuant to the terms and conditions herein (it being agreed and acknowledged that the Down Payment shall not be deemed an asset of the Debtor's estate unless and until a default by Purchaser has occurred hereunder entitling the Debtor to the Down Payment or following closing); and the sum of $2,300,000.00, the difference between the Purchase Price and the Down Payment, as adjusted by closing prorations (the "Balance"), in full on the Closing Date. Purchaser will pay the Balance to _____ as Attorneys, by wire or unendorsed certified or official bank check drawn on a bank or trust company that is a member of the Federal Reserve System, to be held in escrow subject to further agreement with _____ Bank. Any checks accepted by the Debtor will be deemed accepted subject to collection.

If the Debtor is unable to obtain the Approval Order or is otherwise unable to perform its obligations under this Agreement, the Debtor has the right to cancel this Agreement and, if Purchaser is not then in default hereunder, the Debtor will refund the Down Payment to Purchaser. Upon such refund, this Agreement will wholly cease and terminate and neither party will have any further claim against the other under this Agreement except as to those provisions that, by their express terms, survive termination. Purchaser's exclusive remedy for the Debtor's inability to obtain the Approval Order or to perform its obligation is to terminate this Agreement and to have the Down Payment returned.

Any and all personal property that may be referred to in this Agreement will be

deemed conveyed by the deed to be delivered hereunder. For sales tax allocation purposes, the Personal Property value is $ 8,000.00 and the Purchase Price is inclusive of such sum. Purchaser is obligated to and shall pay any such sales tax obligation. Any personal property that is owned by the manager of the Premises or through any tenant or person in possession of the Premises, or any portion thereof, is excluded from this Agreement. Any and all insurance proceeds for claims arising prior to the Closing, irrespective of the date of receipt of such insurance proceeds, are excluded from this Agreement and remain the property of the Debtor's estate. This provision shall survive Closing.

### 1. **Bankruptcy Court Approval**.

(a). Debtor's obligations under this Agreement are entirely subject to, and contingent upon approval of the transaction embodied in this Agreement by the Court, as may be reflected in the Approval Order, or other orders of the Court contemplated in this Section 3. Purchaser acknowledges that the Debtor will submit the Agreement seeking approval of the terms and conditions of the Agreement and authorization of the sale of the Premises. The Debtor will utilize its best efforts to obtain Court approval of this Agreement and will timely submit all motions or orders in connection therewith. The Debtor will seek an Order of the Court establishing and approving bid procedures and an auction sale date will be fixed for the conduct of an auction (the "Auction"). Following the Auction, Debtor will seek the Court's approval of the sale.

(a)    Debtor will propose to the Court, for its approval, that the terms and conditions of sale to govern the proceeding at the Auction will provide that in order to be considered by the Court, any competing offer (a. "Competing Offer") must satisfy the following terms and conditions: (i) a Competing Offer must provide for an all cash purchase price that is at least $100,000.00 higher than the Purchase Price (the "Initial Bid"); (ii) the Competing Offer must be substantially similar to the terms and conditions of this Agreement, subject to such modification as within the sole discretion of the Debtor, following consultation with Santander Bank; (iii) a bidder submitting a Competing Offer (the "Competing Offeror") must sign an Agreement agreeing to be bound by the terms and conditions of the sale that will be promulgated by the Debtor; (iv) the Competing Offeror must demonstrate, to the satisfaction of both Debtor (in consultation with Santander Bank) and the Court, in their discretion, evidence of its ability to conclude the transaction on the terms and conditions of this Agreement, without material delay; (v) the Competing Offeror must provide, at or before the Auction, a certified check made payable to _____ in the sum of $100,000.00 as an initial deposit; (vi) in the case of any subsequent Competing Offer after the Initial Bid to be made by a third party (which may include Purchaser), the bidding will be in increments of $100,000.00, or such other amount as the Debtor following consultation with Santander Bank deems appropriate in its sole discretion.

(b)    Debtor's obligations under this Agreement are conditioned upon Debtor's not receiving, after notice and hearing (including, at the Auction), a Competing Offer that is a higher or better offer approved by the Court. If such a higher and better offer is accepted, approved or authorized by the Court, (i) this Agreement will be null and void and Debtor will return the Down Payment to Purchaser promptly after the Auction; and (ii) after Debtor returns the Down Payment to Purchaser, and the Reimbursement Fee (as defined herein and upon the terms and conditions set forth herein), neither party will have any further rights or obligations hereunder, except obligations under this Agreement that, by their express terms, survive the termination of

1

this Agreement. The successful bidder must, within one business day, supplement its deposit, to the sum of 10% of the successful bid. If Purchaser has bid an amount at the Auction that is next highest to the Competing Offeror (the "Second Bid"), this Agreement will remain in effect until the Competing Offeror posts the full 10% of its successful bid with the Debtor or defaults in its obligation; in the latter event, Purchaser will be obligated to close title under this Agreement at a Purchase Price equal to the Second Bid within ten (10) business days notice from Debtor that the Competing Offeror has defaulted in its obligation and that Debtor will convey the Premises to Purchaser.

(c)     If Purchaser is not the approved successful bidder at the Auction, does not acquire the Premises, and is not the holder of the Second Bid and/or does not opt to hold the Second Bid, then this Agreement will be deemed canceled, in which event, (i) this Agreement will be null and void; (ii) the Debtor will return the Down Payment with accrued interest to the Purchaser; (iii) Purchaser shall, upon submission of satisfactory proof to the Debtor in consultation with Santander Bank, be entitled to receive from the proceeds of any such higher sale ("Higher Sale") to a successful bidder of the Premises, a reimbursement of its actual, reasonable expenses not to exceed the sum of $35,000.00, to be paid only from the proceeds from the Higher Sale of the Premises (the "Reimbursement Fee"), with such proof to be submitted by the Purchaser within five (5) days of the closing with the successful bidder, and payment of the Reimbursement Fee to be made by the Debtor from the proceeds from the Higher Sale within five (5) days from receipt of the aforesaid proof of Purchaser's actual expenses, and (iv) after the Debtor returns any sums paid by Purchaser toward the Purchase Price and pays the Reimbursement Fee, to Purchaser, neither party will have any further rights or obligations hereunder, except obligations under this Agreement that, by their express terms, survive the termination of this Agreement.

## 2.  **Conditions of Sale**.

(a)     Purchaser's obligations hereunder are not conditioned or contingent upon Purchaser obtaining a mortgage or financing from any source.

(b) Except to the extent that a representation is made specifically elsewhere in this Agreement, Debtor has not made and does not make any representations as to the physical condition, rents, leases, expenses, operations, value of the land or buildings thereon, or any other matter or thing affecting or related to the Premises or Personal Property or this transaction, which might be pertinent to the purchase of the Premises or the execution of this Agreement. Specifically, and not by way of limitation, Debtor has not made, and does not make, any representations as to (i) the current or future real estate tax liability, assessment or valuation of the Premises; (ii) the potential qualification of the Premises for any and all benefits conferred by federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (iii) the compliance of the Premises, in its current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance in respect to the Premises, noncompliance, if any, with said zoning ordinances; (iv) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Premises from any

source, including, but not limited to, any state, city or federal government or institutional lender; (v) the current or future use of the Premises; (vi) the present and future condition and operating state of any and all machinery or equipment on the Premises and the present or future structural and physical condition of any building thereon or its suitability for rehabilitation or renovation; (vii) the ownership or state of title of any personal property on the Premises; (viii) the presence or absence of any laws, ordinances, rules or regulations issued by any governmental authority, agency or board and any violations thereof; the compliance with environmental laws and the presence or absence of underground fuel storage tanks, any hazardous materials or asbestos anywhere on the Premises.  Purchaser hereby expressly acknowledges that no such representations have been made. Debtor is not liable or bound in any manner by expressed or implied warranties, guaranties, promises, statements, representations or information pertaining to the Premises, made or furnished by any real estate broker, agent, employee, servant or other person representing or purporting to represent Debtor unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth herein.  All understandings and agreements heretofore had between the parties are merged in this Agreement, which alone fully and completely expresses their agreement.

(c)    Subject to paragraph 12, Purchaser has examined the Premises and Personal Property and any and all buildings and improvements thereon erected, both inside and outside, and the contents thereof, and covenants and agrees to accept title to the Premises in its "as is", "where is" condition on the date of this Agreement, subject to normal or reasonable use, wear and tear and deterioration through Closing, and the Debtor is not obligated to make any repairs, alterations, improvements or additions thereto whatsoever.

**(d) Due Diligence - Hazardous Materials - Phase I Environmental Site Assessment**

(i) Purchaser's Independent Investigations. For all purposes of this Agreement, Purchaser acknowledges and agrees that Purchaser has been provided with adequate and sufficient access to the Property prior to the date of this Agreement and during the due diligence period, which shall expire 21 days from the date a fully executed Agreement is delivered to counsel for the Purchaser (the "Due Diligence Period"), to conduct its own inspections, tests, investigations, environmental audits and other reviews of the Premises as Purchaser deems necessary or appropriate, and Purchaser is relying on its own such inspections, tests, investigations, environmental audits and other reviews in determining the advisability of acquiring the Premises. Any reports obtained by Purchaser pursuant to this paragraph shall be made ·available to the Debtor, its professionals, and all other interested parties and potential bidders upon request.

(ii) Contract Rescission. In the event petroleum, hazardous, radioactive and/or toxic substances, each such term as defined by Federal, State and/or local law and regulations ("Hazardous Materials") are found on the Premises at any time prior to the expiration of the Due Diligence Period, Purchaser may proceed with the purchase of the Premises subject to an

abatement of the Purchase Price so long as the Debtor (in consultation with Santander Bank) and Purchaser can agree upon such abatement, or Purchaser may rescind this Agreement by delivering notice of such rescission within three (3) business days of the expiration of the Due Diligence Period, in which case Debtor must within 30 days' receipt of such notice refund the Down Payment to the Purchaser.

           (iii) All notices or demands sent under this section shall be in writing and sent pursuant to the express notice provisions of this Agreement.

    (e)      Debtor will deliver such title as _____ will be willing to insure, in accordance with its then standard form of title policy, subject to the Permitted Encumbrances. If any title company employed by Purchaser is unwilling to insure the title that Debtor is required to deliver under this Agreement, Debtor will have the right to attempt to produce such a policy, to be paid by Purchaser, from First American Title. The form of deed will be a bargain and sale deed with covenants against grantor's acts.

    (f)      The sale is being made in accordance with the provisions of Bankruptcy Code §363 (and may be effectuated in connection with a plan and disclosure statement, if applicable in the Bankruptcy Case) with the Premises and Personal Property to be sold free and clear of all liens, claims, taxes and encumbrances of whatever kind or nature (the "Liens"), with Liens to attach to the net proceeds of the Purchase Price, in the order of priority of such Liens. Purchaser agrees that for the purposes of this Agreement, the Approval Order will suffice for the purpose of rendering title insurable, notwithstanding any contrary position that may be taken by a title company or abstract company that may be retained by Purchaser.

    3.      Disposition of Down Payment. The Down Payment will be held and disbursed as follows: (a) if the Closing takes place, the Down Payment will be retained by the Debtor's estate; (b) if this Agreement is terminated in accordance with its terms, the Down Payment will be paid to, or upon the instructions of, the party entitled thereto in accordance with the provisions of this Agreement; or (c) if the Closing does not take place by reason of the failure of a party to comply with such party's obligations hereunder, the Down Payment will be paid to the party entitled thereto in accordance with the provisions of this Agreement.

4.      **The Closing**.

    (a)      The deed and other closing documents will be delivered upon the receipt of the Purchase Price at a location to be determined on the Closing Date, with such delivery of deed and receipt sometimes referred to herein as the "Closing", Subject to paragraph 1 above, time is of the essence with respect to Purchaser's obligations to pay the Purchase Price, and to accept the deed of conveyance, within five (5) business days of the Closing Date, or such

later day to which the Closing may be adjourned by Debtor.

    (b)    Debtor will have the right to adjourn the Closing one or more times in order to

perform its obligations under this Agreement. Purchaser will have a one-time right to adjourn the Closing for 20 days; thereafter, Purchaser will not have a right to further adjourn the Closing, with time being of the essence with respect to Purchaser's obligations to pay the Closing Balance and accept the deed of conveyance on the Closing Date. Such right to adjourn will be exercised by notice of exercise given by the respective party in accordance with the provisions of this Agreement governing the giving of notice, provided that notice of exercise may be given orally if exercise is made at the date, time and place then scheduled for Closing and confirmed by the transmission of written notice on such date in accordance with such provisions.

(c)    At Closing, Purchaser will deliver: (i) the Purchase Price; (ii) the transfer tax returns referred to in Section 22; (ii) such documents reasonably necessary to demonstrate that the transactions contemplated by this Agreement have been duly authorized by all necessary organizational action of Purchaser; and (iii) any such other documents necessary to effectuate this Agreement and the Closing on the sale of the Premises.

(d)    At Closing, Debtor will deliver, or cause to be delivered, to Purchaser the following items (all duly executed and acknowledged where required): (i) a duly executed and acknowledged bargain and sale deed with covenants against grantor's acts, in proper statutory short form for recording containing the covenant required by subdivision 5 of Section 13 of the Lien Law; (ii) an affidavit under "FIRPTA"; (iii) the transfer tax returns referred to in Section 22; (iv) the Approval Order; and (v) any such other documents necessary to effectuate this Agreement and the Closing on the sale of the Premises and Personal Property.

5.    Adjustments and Prorations. The following are to be apportioned as of midnight of the date before Closing Date:

(a)  To the extent paid for by Debtor, Debtor will be credited in the adjustments with the cost of the fuel if any, and applicable New Jersey sales tax, at the delivered price thereof to the Premises or the market price on the agreed date of adjustments, whichever is higher. The certificate of any representative of the fuel company from whom Debtor has purchased its fuel will be conclusive as to the amount of the fuel.

(b)  All real estate taxes, water charges and sewer rents.

(c)  Electric meter charges with electric meter to be read prior to Closing.

6.    Intentionally Omitted

7.    **Title Report:  Title Obligations**.

(a) Purchaser will promptly order an examination of title of the Premises (the "Title Report") within five (5) business days from receipt of an executed copy of this Agreement from New York Land Services and will send a copy of the Title Report to Debtor's attorneys and Santander Bank's attorneys designated below.

(b)    Purchaser has the right, at its sole expense, to complete a new survey of the Premises in connection with its title review. Purchaser will provide a copy of the most recent survey of the Premises, if available.

(c)    If, there are any objections to title that Debtor is unable to remove at or prior to the scheduled or any adjourned date of Closing (other than the Permitted Encumbrances which Debtor has no obligation to remove and Purchaser agrees to take "subject to"), and which objections may, according to reasonable expectations, be removed within sixty (60) days after such date, Debtor, if he elects at its sole discretion to cure such objections, will be entitled to one or more adjournments of the Closing for the purpose of such removal for a period not exceeding the aggregate of sixty (60) days. However, any action taken by Debtor to remove such defect, lien and/or encumbrance will not be deemed an admission on Debtor's part that such defect, lien, and/or encumbrance is one which would give Purchaser the right to cancel this Agreement. Purchaser shall have those rights as set forth in paragraph 1 above.

(d)    The following are permitted encumbrances (the "Permitted Encumbrances") and are not, and will not constitute, objections to title:

1. Covenants, restrictions, agreements, easements and rights of way of record, if any, provided the title insurance company used by Purchaser (the "Title Company") at no additional premium or charge, will give affirmative insurance that such covenants, restrictions, agreements and easements and rights of way (a) are not currently violated and (b) do not materially interfere with the current manner of use of the Premises or the buildings and improvements thereon.

2. State of facts that a now accurate survey may show.

3. Rights, if any, of any utility company to construct and/or maintain lines, pipes, wires, cables, poles, conduits and distribution boxes and equipment in, over, under, and/or upon the Premises or any portion thereof.

4. Any and all laws, statutes, ordinances, codes, regulations or requirements, including, without limitation, building, zoning and other land use restrictions, ordinances, and regulations, affecting the Premises adopted by the city, in which the Premises lie or by any other governmental authority having jurisdiction thereof, and all amendments or additions thereto now, or which, at the time of Closing are in force and effect.

5.  Real estate taxes, water rates, water frontage charges, sewer taxes, and charges based thereon, including, without limitation, those that are to become due and payable after the Closing.

6.  Possible encroachments of retaining walls, bay windows, hedges, stoops, gratings, steps, balconies, eaves, trim, cornices, copings, cellar doors, sidewalk elevator, railings and coping, or fences, if any, upon any street, highway, sidewalk or adjoining premises, variations between record line and fences, hedges and retaining walls, provided they do not render title unmarketable or prohibit the continued use of the Premises..

7.  Minor variations between the legal description set forth on Schedule "A" and the tax map description, which will not render title unmarketable or prohibit the continued use of the Premises.

11.  Purchaser's Default/Damages. If Purchaser fails or refuses to comply with and perform all of the terms, provisions, conditions, agreements, and obligations on Purchaser's part to be observed, kept and performed pursuant to this Agreement for any reason other than (a) the absence of an event or state of facts which conditions Purchaser's obligation to close hereunder or (b) the material breach of any representation or warranty made by the Debtor, if any, herein, the Debtor will retain the Down Payment as liquidated damages for such failure or refusal of Purchaser to consummate this transaction or for any noncompliance, nonperformance, breach or default by Purchaser, including, without limitation, for the Debtor's loss of its bargain as embodied herein. The parties agree that the Down Payment represents a reasonable measure of the amount of damages that would be sustained by the Debtor in the event of Purchaser's default.

## 12.    Casualty Damages: Takings.

(a)    If, before the Closing, the entire Premises is taken by condemnation or eminent domain, this Agreement will be automatically canceled, any sums paid by Purchaser toward the Purchase Price will be returned to Purchaser in which event neither party will have any further liability or obligation to the other under this Agreement. If before the Closing Date (i) less than all of the Premises is taken by condemnation or eminent domain, or (ii) there is any taking of land lying in the bed of any street, road, highway or avenue, open or proposed, in front of or adjoining all or any part of the Premises, or (iii) there is any change of grade of any such street, road, highway or avenue, then Purchaser may, at its option, cancel this Agreement, in which event Debtor will return any sums paid by Purchaser toward the Purchase Price to Purchaser in which event neither party will have any further liability or obligation to the other. If Purchaser does not cancel this Agreement, Purchaser will accept title to the Premises subject to the taking or change of grade, in which event at the Closing, Debtor will assign the proceeds of the award or payment to Purchaser with any moneys theretofore received by Debtor in connection with such taking or change in grade.

9

(b)      If, before the Closing, the Premises are materially damaged as the result of fire or other casualty, Purchaser will have the option to (a) accept title to the Premises without any

abatement of the Purchase Price, in which event all of the insurance proceeds will be assigned by Debtor to Purchaser at the Closing and any moneys theretofore received by Debtor in connection with such fire or other casualty will be paid over to Purchaser, or (b) cancel this Agreement, in which event Debtor will return the Down Payment to Purchaser and thereupon neither party will have any further liability or obligation to the other under this Agreement.

13.  Intentionally Omitted.

14.  Notices.

Any notice or demand required by, or desired to be sent under, this Agreement must be in writing and must be sent, to the party at its address set forth in the preamble by mailing the same by express mail, or delivery by Federal Express or by other nationally recognized overnight courier using a written receipt or other valid written proof of delivery, or by hand delivery using a written receipt. The attorneys for the parties may give notices or demands on behalf of their respective clients. Either party may designate by written notice, in writing, a new or other address to which notices or demands are thereafter to be sent. Copies of all notices will be sent as follows:

If to Debtor, a copy will be sent to:
John DiNaso & Sons, Inc.
520 Industrial Loop
Staten Island, NY 10308


with a copy to:

Rash & Baskshi
45 Rockefeller Plaza
Suite 2000
New York, NY 10111



If to Purchaser, a copy will be sent to:


with a copy to:

_____

10

_____

and to:

_____

15.    Broker, Debtor and Purchaser each represent to each other that such party has not dealt with any broker, salesperson or finder in connection with the transaction evidenced by this Agreement, or other party who may claim to have introduced Purchaser to the Premises, other than _____. Any commission or compensation to be paid to such broker shall be paid only pursuant to an Order of the Court. Purchaser and Debtor each agree to indemnify each other from and against any and all liabilities, damages, claims, losses, costs and expenses (including reasonable attorney's fees) arising out of a breach of the foregoing representation. The provisions of this paragraph will survive the Closing or other termination of this Agreement.

16.    **Debtor's Representations and Warranties**.

(a)    Debtor makes the following representations and warranties to Purchaser in connection with the Premises to Debtor's actual knowledge:

(1)    Subject to the entry of the Approval Order, Debtor has the legal power, right and authority to enter into this Agreement and to consummate the transaction contemplated hereby.

(2)    Except for Purchaser's rights hereunder no person, firm or entity, has any rights to acquire the Premises or any part thereof.

(3)    Debtor is not a "foreign person" as defined by the Internal Revenue Code and regulations promulgated thereunder, and at the Closing, upon request by Purchaser, Debtor will deliver an appropriate certification to that effect.

(b)    There are no service and maintenance contracts affecting the Premises to which Debtor is a party, except as otherwise may be agreed on by the parties.

(c)    The foregoing representations will survive the Closing.

## 17.    **Purchaser's Representations and Warranties**.

(a)  Purchaser has the legal power, right and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The individual executing this Agreement on behalf of Purchaser has the legal power, right, and actual authority to bind Purchaser to the terms and conditions of this Agreement.

(b)    As of the date hereof, all necessary action has been taken by Purchaser in connection with the entering into this Agreement and the consummation of the transactions contemplated hereby.

(c)    This Agreement and all documents required hereby to be executed by Purchaser are and will be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

## 18.    **Limitation on Debtor's Liability.**

(a)    If the Debtor is unable to convey title to the Premises in accordance with the provisions of this Agreement for any reason, the Debtor's sole obligation and liability hereunder will be to cause the Down Payment to be refunded to Purchaser, and thereupon all rights and obligations hereunder, by either party against the other will cease and terminate, except to the extent that this Agreement provides for their survival after termination and this Agreement will be null and void and the lien, if any, of Purchaser against the Premises will wholly cease. The Debtor will not be required to bring any action or proceeding or otherwise to incur any expense to render the title to the Premises insurable, subject to the Permitted Encumbrances. Purchaser, without reduction of, or credit or allowance against the Purchase Price and without any liability on the part of the Debtor, may accept such title as the Debtor is able to convey. If there is any conflict between the provisions of this subparagraph and any other provision of this Agreement, then the provisions of this subparagraph will govern and predominate.

(b)    Purchaser waives any right it may have to bring an action against Debtor, its remedies being limited to cancellation. Purchaser expressly waives the right to file a lis pendens, or take any other action that would adversely affect Debtor's ability to convey title to the Premises free and clear of any claim of Purchaser. This Agreement is "non-recourse" as to the Debtor and the Debtor's estate. Purchaser agrees to look solely to the Premises and any sums paid by Purchaser toward the Purchase Price for the satisfaction of Purchaser's remedies for the collection of a judgment (or judicial process) requiring the payment of money by the Debtor in the event of any default or breach by the Debtor with respect to any of the terms, covenants and conditions of this Agreement to be observed and/or performed by the Debtor. The provisions of this section will survive the Closing or other termination of this Agreement.

**19.     Maintenance of Premises through Closing; Certiorari Proceedings.**

(a)     Between the date hereof and the date of Closing, Debtor will:

1.     use commercially reasonable efforts to maintain the Premises and utility systems, until Closing.

2.     maintain the current insurance policies (or renewals thereof) in full force and effect until the Closing;

3.     not remove any fixtures included in this sale from the Premises unless the same are replaced with items of similar quality before Closing;

4.     permit Purchaser or Purchaser's agents to inspect the Premises from time to time, provided that (a) Purchaser gives the Debtor reasonable advance notification of the intention to conduct any such inspection, and (b) such inspection does not unreasonably impede the normal day-to-day business operation of the Premises. Purchaser hereby agrees to, and will indemnify and hold Debtor harmless from and against any and all costs, losses, damages and expenses Debtor suffers or incurs by reason of such inspections, including, without limitation, reasonable attorneys' fees and disbursements.  The indemnity from Purchaser to Debtor as above set forth in this paragraph will survive the Closing or other termination of this Agreement;

5.     not enter into any new service contract.

6.     not enter into any new lease.

(b)     Debtor may commence or continue any proceeding for the reduction of the assessed valuation of the Premises, and to try to settle the same in Debtor's discretion provided, however, that the net refund of taxes, if any, for any tax year for which Purchaser is entitled to share in the refund will be divided between Debtor and Purchaser in accordance with the proportion of said period covered by such refund in which the Premises was owned by Debtor to the entire period covered, after deducting therefrom a pro rata share of all expenses, including counsel fees, necessarily incurred in obtaining such refund, the allocation of such expenses to be based upon the total refund  obtained in the proceeding and in any other proceeding simultaneously involved in the trial or settlement. Purchaser will deliver to Debtor, upon demand, receipted tax bills and canceled checks used in payment of such taxes and will execute any and all consents or other documents, and do any act or thing necessary for the collection of

13

such refund by Debtor. Any refunds due for periods before Purchaser's ownership will remain the property of Debtor. The Debtor shall not make any settlement binding on any future tax years. If Purchaser seeks and/or obtains a reduction in assessed valuation for any partial or full tax year period in which the Premises was owned by the Debtor (the "Period of Debtor's Ownership"), the net refund, based upon the same terms and conditions set forth earlier in this paragraph, shall be held in escrow by Purchaser's attorney. Purchaser shall, (a) within five (5) business days, notify Debtor of the receipt of such net refund, and (b) upon agreement by the Debtor and Purchaser as to the proportion of such refund that is property of the Debtor's estate, within five (5) business days, remit such net refund proceeds for the Period of Debtor's Ownership to the Debtor's counsel at the address and pursuant to the requirements for notice purposes in paragraph 14 herein. If any such proceedings to reduce the assessed valuation are commenced by Purchaser, Purchaser shall notify Debtor of such commencement and provide the Debtor with copies of any documents relating to the proceeding. The provisions of this paragraph will survive the Closing.

20. Successors and Assigns. This Agreement will be binding upon, and will inure to the benefit of, the respective parties and their successors and permitted assigns. Purchaser's rights under this Agreement may not be assigned without the prior written consent of Debtor in each instance (which Debtor may grant or withhold in Debtor's sole and absolute discretion) and any assignment or attempted or purported assignment made without such consent will be null and void and of no force or effect and will constitute a non-curable default by Purchaser, subject to the provisions of Section 11 of this Agreement. Purchaser may however assign its rights under this Agreement, immediately before the Closing, simultaneously with the payment· of the Purchase Price to the Debtor, to any entity owned and controlled by Purchaser, or by the parties holding a 51% percent in Purchaser and the power to control its management, upon appropriate proof of same delivered to Debtor. No such permitted assignment will relieve Purchaser of any of its obligations under this Agreement.

21. Prohibition Against Recordation. Purchaser may not record this Agreement and any recordation or attempted recordation by Purchaser hereof will be void and of no effect and will constitute a non-curable default by Purchaser under this Agreement entitling Debtor to terminate this Agreement, subject to the provisions of Section 11 of this Agreement.

22. Transfer Taxes. To the extent that any transfer taxes are not exempt from payment under Bankruptcy Code §1146 (a), any real property transfer taxes that are due in connection with this transaction will be paid by Purchaser, including without limitation transfer taxes payable to the state of New Jersey and any local tax. If applicable, based upon the circumstances in the pending Bankruptcy Case, the Debtor shall attempt to sell the Premises in accordance with a plan and free of any transfer taxes under Bankruptcy Code §1146(a).

23. No Lien. No lien or encumbrance will arise against the Premises in favor of Purchaser from this Agreement or any monies deposited hereunder.

24. Entire Agreement: Construction. This instrument constitutes the entire

agreement between the parties and there are no other covenants, promises or agreement, written or oral, and no agent of either party has the authority to make representations or other agreements, verbal or written which modify or vary the terms or conditions of this Agreement. This Agreement supersedes and cancels any and all negotiations, arrangements, agreement and understandings, if any, between the parties hereto. This Agreement will be deemed to have been jointly drafted by the attorneys for both parties and will be construed neither for or against the Debtor or Purchaser. The singular will include the plural, and vice versa, and masculine, feminine and neuter pronouns will be fully interchangeable, where the context so requires. References to "hereof ' or "hereunder" set forth in this Agreement will refer to this entire Agreement and not to the section or subsection in which they appear unless there is no reasonable construction to that effect.

25.    Modification. This Agreement may not be changed or terminated orally. The provisions hereof will apply to and bind the heirs, executors, administrators, successors and permitted assigns of the respective parties.

26.    Enforceability. If any provision of this Agreement is determined to be unenforceable or invalid, such invalidity or unenforceability will not affect the remaining provisions of this Agreement, as the provisions of this Agreement are intended to be and will be severable. It is the intention of the parties that if any provision of this Agreement is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, then the provision will have the meaning that renders it valid.

27.    Severability. If any provision of this Agreement is found to be void or unenforceable by a court of competent jurisdiction, the remaining provisions will nevertheless be binding upon the parties with the same force and effect as though the void or unenforceable part had been severed and deleted.

28.    Gender. A reference in this Agreement to any gender includes any other one gender and the singular includes the plural, and vice versa, unless the context requires otherwise.

29.    Waiver.  Any failure by Debtor to insist upon strict performance by Purchaser of any of the provisions of this Agreement will not be deemed a waiver of any of the provisions of this Agreement, despite the number of violations or breaches that may occur, and Debtor, notwithstanding any such failure, will have the right thereafter to insist upon strict performance by Purchaser of any and all of the provisions of this Agreement to be performed by Purchaser.

30.    Binding Effect. Debtor's delivery of this Agreement for inspection by Purchaser is not an offer and does not create any rights in favor of Purchaser or others or create any obligation upon Debtor. This Agreement will have no force or effect unless and until it

15

has been fully executed, delivered, exchanged, and approved by the Bankruptcy Court.

31.    Construction. The provisions of this Agreement will be governed by,  and construed and enforced according to, the laws of the State of New York applicable to agreements made and to be performed wholly therein and applicable federal law. The parties hereby consent to the jurisdiction of the courts of the State of New Jersey. Any action or proceeding arising out of this Agreement will be brought exclusively in the United States Bankruptcy Court for the Eastern District of New York. This Agreement will be construed and interpreted without regard to any presumption or other rule requiring construction or interpretation against the party causing this Agreement to be drafted.

32.    Waiver of Jury Trial.   Except as prohibited by law, the parties waive trial by jury in any litigation arising out of, or connected with, or relating to, this Agreement or the relationship created hereby. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such matter as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

33.    Survival. No provision of this Agreement will survive the closing, except those obligations expressly stated therein to survive or to be performed subsequent to the Closing Date.

34. Counterpart Execution. This Agreement will not be binding unless a fully executed counterpart has been delivered to each of the parties. This Agreement may be executed in counterparts.  This Agreement is subject to Bankruptcy Court approval.

35.    Section Headings. The section headings used herein are for convenience of reference only and will not limit or define the provisions of this Agreement.

[The remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties have signed this Agreement on the date first written above.

John DiNaso & Sons, Inc.
Chapter 11 Debtor (Seller)


By:_____
    John DiNaso, President



Purchaser:


By:_____

SCHEDULE "A"

Property description.

**SCHEDULE "B"**

Office Equipment
Office Furniture
Tables
Chairs
Decorations


Various Small Tools

Inventory

Various Small Items

**20**