# CONTRACT OF SALE

This CONTRACT OF SALE (this "Agreement") is dated as of October 6, 2014 (the "Effective Date") and is entered into: between GREG MESSER, AS CHAPTER 7 TRUSTEE OF DINASSO & SONS BUILDING SUPPLY COMPANY, [   ] having an address at 26 Court Street, Suite 2400, Brooklyn, New York 11242 (the "Seller") and 133 OCEAN AVENUE, LLC, having an address at 450 W. Kennedy Blvd., Lakewood, New Jersey 08701, or its Designee ("Purchaser" and, together with the Seller, the "Parties" or a "Party").

## RECITALS

**WHEREAS**, Seller is the Chapter 7 Trustee of the DiNaso and Sons Building Supply Company, Inc., a bankruptcy proceeding commenced on May 7, 2014, Case No. 14-42298 (CEC) and converted to Chapter 7 on September 9, 2014 (the "Chapter 7 Proceeding"), before the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"); and

**WHEREAS**, subject to entry of the Sale Approval Order (as defined below) by the Bankruptcy Court and in accordance with the Sales Procedures Order (as defined below), Seller wishes to sell, and Purchaser wishes to purchase, the Property (hereinafter defined) in accordance with the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged by Seller and Purchaser, and each intending to be legally bound by this Agreement, the Parties covenant and agree as follows:

1. DEFINITIONS AND INTERPRETATIONS

   1.1 Definitions. Unless the context clearly indicates to the contrary, terms defined in the heading, recitals or elsewhere in this Agreement shall have the meanings assigned to them whenever initially capitalized in this Agreement, including the terms set forth below:

   "Bankruptcy Code." Title 11 of the United States Code, §§101 *et. seq.*

   "Closing." The consummation of the sale and purchase of the Property contemplated by this Agreement and the Sale Approval Order.

   "Closing Date." Not later than the date which is thirty (30) days after the entry of the Sale Approval Order by the Bankruptcy Court (or the following business day, if said 30th calendar day is not a business day).

"Deposit." The amount to be deposited (or which is deemed to have been deposited) by Purchaser with Escrow Agent simultaneously with the execution hereof in accordance with Section 4.1(a) below, to be held and administered in accordance with Section 4.2 below.

"Escrowee." Robinson Brog Leinwand Greene Genovese & Gluck P.C., the party designated to hold the Deposit in trust under the provisions of Section 4.2 below.

"Final Order." means an action taken or order entered by the Bankruptcy Court as to which: (a) no request for stay of the action or order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it has passed, including any extensions thereof; (b) no petition for rehearing or reconsideration of the action or order, or protest of any kind, is pending before the Bankruptcy Court and the time for filing any such petition or protest is passed; (c) the Bankruptcy Court does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (d) the action or order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Fixtures." Gas, electric, and other utility fixtures; heating, ventilation and cooling systems; telephone, television, cable and other communications wiring, cables, antennae and other devices; tanks; linoleum, wall to wall carpeting and other floor coverings; screens, shades, awnings and other interior and exterior window and entranceway treatments; and any and all other tangible personal property, to the extent owned by Seller and affixed to and used in the operation of the Property.

"Improvements." Any buildings, Fixtures, fences, plantings and other improvements and installations located on or beneath the Land.

"Land." That certain tract or parcel of land more specifically described on Exhibit A annexed to this Agreement and commonly referred to and known as 133 Ocean Avenue, Lakewood Township, New Jersey; together with all right, title and interest of Seller in and to (a) the land constituting any public street, road or avenue, opened or proposed, in front of or adjoining said tract or parcel of land, to the center line thereof, (b) any award made or to be made in lieu thereof and any unpaid award for damages to said tract or parcel of land or the Improvements by reason of change of grade of any street, road or avenue, (c) all rights, royalties, profits, licenses, usufructs and benefits appurtenant to the Land, including, but not limited to, mineral rights, oil and gas rights, and the right to the exploitation of same and rents, profits and royalties therefrom, (d) all easements, rights of way, reservations, appurtenances, and other estates and rights of Seller, if any, pertaining to the Land or Improvements, (e) all

right, title and interest of Seller in and to all strips and gores and all alleys adjoining the Land, and (f) all privileges appurtenant or related to any of the foregoing.

"Property." The Land, together with the Improvements thereon located, together with all property, rights and interests to be sold by Seller to Purchaser as set forth in this Agreement.

"Purchase Price." The amount set forth in Section 4.1 below as the total consideration to be paid by Purchaser to Seller for the Property.

1.2 Interpretations. Unless otherwise specified or required by the context of this Agreement, the following rules of construction shall be applicable for all purposes of this Agreement and all documents supplemental hereto:

1.2.1 All references herein to numbered sections, subsections, schedules or exhibits are references to the sections and subsections hereof and the schedules or exhibits attached hereto.

1.2.2 The terms "include," "including" and similar terms shall be construed as if followed by the phrase "but not limited to."

1.2.3 The terms "buildings," "structures," "improvements," "Land," "Property," "Fixtures," "Improvements" and similar terms shall be construed as if followed by the phrase "or any part thereof."

1.2.4 Singular words include the plural and plural words include the singular.

1.2.5 Words importing any gender include the other gender and the neuter.

1.2.6 The term "person" shall include natural persons, firms, partnerships, incorporated or unincorporated associations, trusts or any other public and private legal entities.

1.2.7 The term "provisions," "terms" or similar words, when used with respect hereto or to any other related document, shall be construed as if preceded by the phrase "terms, covenants, agreements, requirements, conditions, restrictions and/or."

1.2.8 The terms "hereto," "herein," "hereof," "hereunder" and similar terms shall refer to this Agreement in its entirety, unless the context clearly indicates otherwise.

1.2.9   Section, subsection, schedule and exhibit captions and any table of contents are used for convenience and reference only and in no way define, limit or affect the construction of the provisions hereof.

1.2.10  No inference shall be drawn against any party from the fact that such party has drafted any portion hereof.

1.2.11  All recitals set forth in, and all exhibits, schedules and other attachments to, this Agreement are incorporated by reference herein.

1.2.12  The term "leases" shall mean "lease, sublease, tenancy, subtenancy, letting, subletting, license, sublicense or other occupancy arrangement."

1.2.13  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or item requires.

1.2.14  The term "date hereof" shall mean the Effective Date. A "business day" is any day which is not a Saturday, Sunday or holiday on which national banks are closed for business within the State of New York.

1.2.15  If any provision of this Agreement shall to any extent be invalid or unenforceable, then the remainder of this Agreement or the application of such provision to persons or circumstances other than those as to which it is held invalid or enforceable shall not be affected thereby and each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

1.2.16  The term "law" shall mean and include any statute, ordinance, rule, regulation, code, order, opinion or similar governmental action or directive, including any executive, court or administrative interpretation, order or decision enforcing or interpreting any of the foregoing. Any reference to statutes, ordinances, rules, regulations or other laws or legal requirements shall include any subsequently enacted amendments thereto and any statutes,

ordinances, rules, regulations or other laws or legal requirements enacted in replacement thereof, in supplementation thereto or in substitution therefor.

1.2.17    The submission of this Agreement for examination does not constitute an offer, reservation of or option for the Property, and this Agreement shall become binding and effective only upon (a) execution by all parties and delivery to all parties, and (b) with respect to Seller, entry of the Sale Approval Order. Seller agrees to use its best efforts to obtain the Bankruptcy Court's approval of the Sale Approval Order.

1.2.18    This Agreement is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms hereof. All negotiations, considerations and representations between the parties have been incorporated herein. No course of prior dealing between the parties or their principals, agents or affiliates shall be relevant or admissible to supplement, explain or vary any of the terms of this Agreement. Acceptance of or acquiescence in a course of performance rendered under this or any prior agreement between the parties or their principals, agents or affiliates shall not be relevant or admissible to determine the meaning of any of the terms of this Agreement. No representations, understandings or agreements have been made or relied upon in the making of this Agreement other than those specifically set forth herein. This Agreement cannot be modified orally, but only by a writing signed by all of the parties hereto or their duly authorized agents.

2. SALE AND PURCHASE OF PROPERTY. Seller hereby agrees to sell and convey the Property to Purchaser, and Purchaser agrees to buy the Property from Seller as is more fully described in the attached Exhibit A, free and clear of any and all liens, claims and encumbrances, including, without limitation, pursuant to, Sections 363(b) and (f) of the Bankruptcy Code, in accordance with, and subject to, the terms and conditions of this Agreement and the Sale Approval Order.

3. TITLE; SELLER REPRESENTATIONS, WARRANTIES AND COVENANTS.

3.1 <u>Status of Title</u>. Seller is the trustee of the estate of the fee owner of the Property and, subject only to the entry of the Sale Approval Order by the Bankruptcy Court, he has the authority and power to sell, convey and transfer the Property in accordance with the provisions of this Agreement. Seller hereby covenants and agrees that it shall, at the Closing, convey good and marketable title to the Property to Purchaser, free of all liens, claims, encumbrances, leases and other restrictions as provided for in the Sale Approval

Order, excepting only the following (collectively, the "Permitted Exceptions"):

    3.1.1 Zoning, building, environmental and other laws, ordinances, codes, restrictions and regulations of governmental authorities having jurisdiction over the Property and the claims thereof accruing after the Closing Date.

    3.1.2 Consents by the Seller or any former owner of the Property for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

    3.1.3 All rights, easements and agreements for the erection and/or maintenance of water, gas, electric, telephone, cable, sewer or other utility pipelines, poles, wires, conduits or other like facilities and appurtenances thereto, over, across and under the Property.

    3.1.4 Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Property over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Property.

    3.1.5 Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Property.

    3.1.6 Any state of facts that an accurate survey would disclose, provided that such facts do not render title uninsurable without additional premium or charge or is a Permitted Exception.

    3.1.7 Subsurface conditions affecting the Land not disclosed by any instrument of record.

    3.2 <u>Foreign Person; Taxes</u>. Seller represents, warrants and covenants that (a) Seller is not a "foreign person" as defined in IRC section 1445 as amended, and the regulations thereunder, and that (b) the taxes for the Property for the fiscal year of 2014 through 2015 shall be prorated at the time of the sale between the Purchaser and the Seller.

    3.3 <u>Curing of Title Objections</u>. Seller shall have the option to cure any title objections that may be cured by the payment of money only or to cause the title company insuring Purchaser's title to omit same as exceptions with no additional charge to Purchaser for title insurance. In the event Seller exercises his option not to cure any title objections as set forth herein, Seller may declare the contract void and return Purchaser's deposit without any other liability to Purchaser.

3.4 <u>Consent.</u> Bankruptcy Court approval is required for the performance by Seller of its obligations hereunder. Seller shall not be obligated to perform its obligations hereunder unless and until this sale is approved by entry of an order of the Bankruptcy Court.

3.5 <u>Patriot Act</u>. Seller is not, and will not be, a Person with whom Seller is restricted from doing business with under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 and Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001 and regulations promulgated pursuant thereto, including persons and entities named on the Office of Foreign Asset Control Specially Designated Nationals and Blocked Persons List.

3.6 Seller covenants and agrees to deliver the Property vacant.

4. CONSIDERATION; ESCROW PROVISIONS.

4.1 Purchase Price. The Purchase Price (subject to adjustment as set forth in the Bid Procedures (as defined below) for the Property is One Million Eight Hundred Thousand Dollars and 00/100 ($1,800,000.00) Dollars, payable as follows:

(a) One Hundred Thousand and 00/100 ($100,000.00) Dollars (the "Deposit") on the signing of this Agreement by good check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to subparagraph 4.3 below; and

(b) the balance of the Purchase Price, by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

4.2. <u>Certified or Bank Checks</u>. All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Deposit shall be payable to the order of Escrowee (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Seller or as Seller otherwise directs. Except for the Deposit and checks aggregating not more than $2,500.00, including payment for closing adjustments, all checks delivered by Purchaser shall be certified or official bank checks as hereinabove provided.

4.3 <u>Escrow Provisions</u>. Escrowee shall hold the Deposit in escrow in a segregated bank account until Closing or sooner termination of this Agreement and shall pay over or apply the Deposit in accordance with the terms of this paragraph. Escrowee shall hold the Deposit in a non-interest bearing account for the benefit of the Parties and Deposit shall be paid to the Party entitled thereto. The Social Security or Federal Employer Identification Numbers of the Parties shall be

furnished to Escrowee upon request. At Closing, the Deposit shall be paid by Escrowee to Seller. If for any reason, the Closing does not occur and either Party gives notice (as described in paragraph 12 herof) to Escrowee demanding payment of the Deposit, Escrowee shall give prompt notice to the other Party of such demand. If Escrowee does not receive notice of objection from such other Party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by notice from the Parties to this Agreement or a final, nonappealable judgment, order or decree of a court, however, Escrowee shall have the right at any time to deposit the Deposit with a court of competent jurisdiction and shall give notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(a) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this Agreement or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this Agreement or involving gross negligence on the part of Escrowee.

(b) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(c) Escrowee acknowledges receipt of the Deposit by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated in this Agreement.

(d) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Deposit or any other dispute between the parties whether or not Escrowee is in possession of the Deposit and continues to act as Escrowee.

5. CLOSING

5.1 <u>Closing Location</u>. The Closing shall take place commencing at 10 a.m. ET in the offices

{00694579.DOCX;1 } 8

of the Escrow Agent or such other location mutually agreed upon by the parties, on the Closing Date.

5.2 Seller Closing Deliveries. At the Closing, Seller shall deliver to the Purchaser the following items duly executed by Seller or its authorized representatives:

5.2.1    A bargain and sale deed with covenant against grantor's acts. The deed shall be in recordable form, contain a legal description in accordance with the deed, and be as otherwise required by Purchaser's title insurance company.

5.2.2    An affidavit of title, sufficient to permit Purchaser's title insurance company to insure title to the Property free and clear of standard exceptions, including, without limitation, certification by Seller that the Property is vacant and free and clear of any and all leases, licenses and other occupancy agreements of any kind on the Closing Date, that there are no vaults forming part of the Property.

5.2.3    A W-9 form and a closing statement.

5.2.4    A Certification of Non-Foreign Status Entity by Transferor (FIRPTA Affidavit).

5.2.5    Such other documents as are contemplated by this Agreement or as may be reasonably required by Purchaser or by Purchaser's title insurance company to issue a title insurance policy insuring Purchaser's title to the Property, subject only to the Permitted Exceptions.

5.2.6    Any keys, existing plans and similar documents relating to any Improvements, to the extent within Seller's possession.

5.2.7    A certified true copy of the Sale Approval Order entered by the Bankruptcy Court.

5.3 Purchaser Closing Deliveries. At the Closing, Purchaser shall deliver the balance of the Purchase Price contemplated by Section 4.1(b) of this Agreement in immediately available funds together with, a closing statement setting forth the Purchase Price and pro-rations contemplated hereunder and such other documents as are contemplated by this Agreement or as may be reasonably required by Seller and Purchaser's title insurance company to issue a title insurance policy insuring Purchaser's title to the Property.

6. CLOSING ADJUSTMENTS

6.1 Apportionments. The following items shall be apportioned between the parties as of 12:00:01 a.m. on the Closing Date:

6.1.1   Real estate taxes, water charges and sewer rents, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

6.1.2   Business improvement district charges ("BID charges"),

6.1.3   Prepaid rents and revenues, if any, from telephone booths, vending machines and other income-producing agreements to the extent collected;

6.1.4   Value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes, as shown on the invoices of Seller's supplier;

6.2   Tax Year. The apportionment of charges shall be upon the basis of the tax year in which the Closing occurs.

6.3   Assessment. If on the Closing Date the Premises shall be affected by an assessment which is or may become payable in annual installments, all installments allocable to the period following the Closing Date shall be Purchaser's responsibility.

6.4   Utility Charges. Seller shall pay outstanding utility company charges through the Closing Date.

6.5   Errors and Omissions. Any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

6.6   Refunds and Abatements. Real estate tax refunds, abatements and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing.

6.7   Water Meter Readings. Prior to the Closing Date Seller shall use commercially reasonable efforts to obtain from the agency of the City of New York having jurisdiction thereof, readings of all water meters at the Property within the 30-day period preceding the Closing Date.

7. CONDITION OF PROPERTY; RELEASE OF SELLER.

7.1   As Is; Where Is. Purchaser acknowledges that it is an experienced and sophisticated purchaser of commercial real estate projects such as the Property and that it has had a full and complete opportunity to conduct such investigations, examinations, inspections and analyses of the Property as Purchaser, in its absolute discretion, may deem appropriate. Except as expressly set forth herein, Purchaser further acknowledges that Purchaser has not relied upon any statements, representations or warranties by Seller or any agent of Seller. Purchaser agrees that the Property shall be sold, and that Purchaser shall accept possession of the Property on the Closing

Date, strictly on an "**AS IS, WHERE IS**" AND "**WITH ALL FAULTS, LIABILITIES, AND DEFECTS, LATENT OR OTHERWISE, KNOWN OR UNKNOWN**" basis, with no right of set-off or reduction in the Purchase Price, and that such sale shall be without representation or warranty of any kind, express or implied, including any warranty of income potential, operating expenses, uses, merchantability or fitness for a particular purpose, and Seller does hereby disclaim and renounce any such representation or warranty.

Purchaser specifically acknowledges that Purchaser is not relying on any representations or warranties of any kind whatsoever, express or implied, from Seller or any broker or other agents as to any matters concerning the Property including: (1) the value of the Property; (2) any income to be derived from the Property; (3) the suitability of the Property for any and all activities and uses which Purchaser may conduct thereon, including the possibilities for further development of the Property or construction thereon; (4) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Property or any improvements thereon; (5) the manner, quality, state of repair or lack of repair on the Property or any improvements thereon; (6) the nature, quality or condition of the Property, including with respect to water conditions, soil, geological or geotechnical condition (including soil expansiveness, corrosivity, or stability, or seismic, hydrological, geological and topographical conditions and configurations, including, without limitation, any opinions or conclusions of any soils engineer(s) retained to perform geotechnical and/or soils studies or to oversee any soils engineering aspects of developing the Property); (7) the compliance of or by Seller, the Property, or its operation with any codes, laws, rules, ordinances, regulations of any applicable governmental authority or body; (8) the manner or quality of the construction or materials incorporated into the Property; (9) compliance with environmental laws or land use laws, rules, regulations, orders, codes or requirements, including, but not limited to, the Americans with Disabilities Act of 1990, the Federal Water Pollution Control Act, the U.S. Environmental Protection Agency regulations at 40 CFR, Part 261, the Clean Water Act, the Safe Drinking Water Act, the Hazardous Materials Transportation Act, the Toxic Substance Control Act, the Industrial Site Recovery Act, and/or any rules or regulations promulgated under any of the foregoing (as the same may be amended from time to time); (10) the presence or absence of radon gas, methane gas, or asbestos any other hazardous materials at, on, under, or adjacent to the Property; (11) the conformity of any improvements to any plans or specifications, including, but not limited to, any plans and specifications that may have been or may be provided to Purchaser; (12) the conformity of the Property to past, current or future applicable zoning or building requirements; (13) deficiency of any undershoring; (14) deficiency of any drainage; (15) the fact that all or a portion of the Property may be located on or near an earthquake fault line or in or near an earthquake or seismic hazard zone; (16) the existence of vested land use, zoning or building entitlements affecting the Property; (17) water rights or the availability of or access to water; (18) the presence or suitability of any utilities or availability thereof; (19) the completeness or accuracy of any information provided to Purchaser by Seller or its agents; or (20) any other matter relating to the Property or to the development,

construction, operation, or sale of the Property. Purchaser and its successors and assigns, hereby expressly waives and releases Seller from any such duty that otherwise might exist with respect to the foregoing.

Except for any representations, warranties, covenants or agreements of Seller expressly set forth in this Contract, Purchaser, for Purchaser and Purchaser's successors and assigns, hereby releases Seller from, and irrevocably and unconditionally waives all claims and liability against Seller for or attributable to, the physical condition and status of the Property listed in the preceding paragraph or any other and any and all statements or opinions heretofore or hereafter made, or information furnished, by or on behalf of Seller to Purchaser or any of Purchaser's agents or representatives relating to the Property. For purposes of clarification, the release contained in this Section does not apply to any claims Purchaser may have for the return of the Deposit or specific performance in accordance with the terms of this Agreement or any other solely Contractual disputes that are not based on the Property condition or status (collectively referred to hereinafter as the "Release Exceptions").

Purchaser acknowledges and agrees that (1) Purchaser may hereinafter discover facts different from or in addition to those now (or as of the Closing) known to Purchaser, (2) Purchaser's agreement to release, acquit and discharge Seller as set forth herein shall remain in full force and effect notwithstanding the existence or discovery of any such additional or different facts, (3) Purchaser knowingly waives any rights, privileges and benefits under any federal, state or local law which may negatively impact the validity or enforceability of any part of the releases set forth in this Agreement, (4) upon the completion of the Closing, Seller shall be deemed to have satisfied all of Seller's obligations, covenants and liabilities in this Agreement and in any documents executed by Seller in connection herewith other than those obligations of Seller that, by the express terms of this Agreement, survive the Closing (in which case such survival shall be subject to the limitations set forth in this Agreement), and (5) Purchaser irrevocably covenants never to commence or prosecute, or to collude with others to commence or prosecute, against Seller any action or proceeding based upon any claim covered by the foregoing release.

Purchaser understands the legal significance of the foregoing provisions and acknowledges and agrees that the provisions of this Section 7 were a material factor in Seller's acceptance of the Purchase Price and that Seller is unwilling to sell the Property unless Seller is expressly released as set forth in this Section 7.

The releases contained in this Section 7 and elsewhere in this Agreement include claims of which Purchaser is presently unaware or which Purchaser does not presently suspect to exist, other than the Release Exceptions, which, if known by Purchaser, would materially affect Purchaser's release of Seller. Purchaser specifically waives the provisions of any law of any state, territory or jurisdiction the import of which is as follows: A general release does not

extend to claims of which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Notwithstanding anything to the contrary in this Agreement, the provisions of this Section 7 shall survive the Closing.

## 8. PURCHASER'S REPRESENTATIONS AND WARRANTIES

8.1 Authority. Purchaser is a limited liability company, duly formed, validly existing and in good standing and authorized to transact business in the State of New Jersey. This Agreement constitutes the valid and legally binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

8.2 Litigation. There are no actions, suits or proceedings pending or, to the knowledge of Purchaser, threatened, against or affecting Purchaser which, if determined adversely to Purchaser, would adversely affect its ability to perform its obligations hereunder.

8.3 Conflicts. Neither the execution, delivery or performance of this Agreement nor compliance herewith (a) conflicts or will conflict with or results or will result in a breach of or constitutes or will constitute a default under (i) the charter documents or operating agreement of Purchaser, (ii) to the best of Purchaser's knowledge, any law or any order, writ, injunction or decree of any court or governmental authority, or (iii) any agreement or instrument to which Purchaser is a party or by which it is bound; or (b) results in the creation or imposition of any lien, charge or encumbrance upon its property pursuant to any such agreement or instrument.

8.4 Consent. No authorization, consent or approval of any governmental authority is required for the execution and delivery by Purchaser of this Agreement or the performance of its obligations hereunder.

8.5 Patriot Act. Purchaser is not, and will not be, a Person with whom Seller is restricted from doing business with under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 and Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001 and regulations promulgated pursuant thereto, including persons and entities named on the Office of Foreign Asset Control Specially Designated Nationals and Blocked Persons List.

Notwithstanding anything to the contrary in this Agreement, the provisions of this Section 8 shall survive the Closing.

## 9. DEFAULT

9.1 Purchaser's Default. If the sale contemplated hereby is not consummated solely because

of a default by Purchaser in its obligation to purchase the Property in accordance with the terms of this Agreement, then: (a) this Agreement shall terminate; (b) and the Seller's sole remedy at law or in equity shall be to retain the Deposit.

    9.2 <u>Seller's Default</u>. If Purchaser shall have performed or tendered performance of all of its material obligations under this Agreement, and the sale contemplated hereby is not consummated because of a default by Seller in its obligation to sell the Property in accordance with the terms of this Agreement, then, Purchaser may, as its sole and exclusive remedy at law or in equity: (a) terminate this Agreement by giving written notice thereof to Seller, in which event the Deposit will be returned to Purchaser and the parties shall have no further obligation to each other except for Purchaser's obligations that expressly survive the termination of this Agreement or (b) waive such default and consummate the transactions contemplated hereby in accordance with the terms of this Agreement. Purchaser hereby irrevocably waives any other right or remedy for such default. Any termination by Purchaser under this <u>Section 9.2</u> must be as to all of the Property, it being acknowledged and agreed that Purchaser shall have no right under this <u>Section 9.2</u> or any other provision of this Agreement to purchase less than all of the Property.

    9.3 If either Party believes the other has defaulted under the terms of this Contract or there is a dispute involving this transaction that would result in the Deposit not being paid to the Party entitled to the Deposit under the terms of this Contract, the Party believing there is a default or dispute must notify the other Party of such default or dispute prior to disbursement of the Deposit by the Escrow Agent which notification must be at least three (3) business days prior to the day demand is made for the release of the Deposit.

    10. RISK OF LOSS; NO OBLIGATION TO REPAIR OR RESTORE. The risk of loss due to damage to the Property beyond ordinary wear and tear prior to the Closing shall be upon Seller. In the event of any loss or casualty affecting the Property in excess of $500,000, Purchaser shall have the right to (a) terminate this Agreement by notice to Seller, whereupon the Deposit shall be refunded to Purchaser and this Agreement shall be deemed terminated and without any further force, effect or obligation of either party to the other, except for those provisions which expressly survive the termination of this Agreement; or (b) proceed with the transactions contemplated hereby, in which case Seller shall assign to Purchaser the proceeds of all insurance maintained by Seller, if any, prior to the Closing with respect to the Property and shall hold any such proceeds received by Seller in trust for Purchaser, to be delivered to Purchaser at Closing.

    11. OMITTED

    12. NOTICES. Any notices or other communications provided for hereunder may be given by a party or its attorney, shall be in writing and shall be either (a) hand-delivered, (b) deposited with a nationwide, overnight courier delivery service for delivery to the other party at the address set forth below or (c) mailed by certified mail, return receipt requested, postage prepaid to the other

party at the address set forth below. All notices shall be given as follows:

If to Seller:

    Gregory Messer, Esq.

    Law Offices of Gregory Messer

    26 Court Street

    Suite 2400
    Brooklyn, NY 11242
    (718) 858-1474
    Fax : (718) 797-5360
    Email: gremesser@aol.com

With a copy to:

    Robinson Brog Leinwand Greene Genovese & Gluck P.C.

    875 Third Avenue

    New York, New York 10022

    Attn: Fred Ringel, Esq

    (212) 603-6300

    Fax: (212) 956-2164

    Email: fbr@robinsonbrog.com

If to Purchaser:

    _____
    _____

    _____

With a copy to:

_____

_____

_____

All notices shall be deemed to have been given either when (a) hand-delivered, with receipt acknowledged in writing, (b) one (1) business day after having been deposited with a nationwide, overnight courier delivery service or for next business day delivery, or (c) three (3) business days following the date of mailing in the metropolitan New York area, postage prepaid, by certified mail, return receipt requested. In order to be effective, copies of any notice having to do with the Deposit or other duties of Escrow Agent must be sent in the manner aforesaid to Escrow Agent at its address set forth on the signature page hereof above. Notices also may be sent by email and will be deemed given (i) if receipt is acknowledged by email or (ii) otherwise when sent provided notice is also given at the same time in accordance with sections (a), (b) or (c) this paragraph.

13. CONDEMNATION.

13.1 Seller represents that it has not received any notice of taking or other notification of anticipated or pending condemnation proceedings affecting the Property. If proceedings to condemn the Property or any part thereof commence before the Closing, or notice of such proposed condemnation, then Purchaser shall have ten (10) days from its receipt of notice of the proceeding in which to terminate this Agreement, whereupon the Deposit and all accrued interest shall be refunded to Purchaser and this Agreement shall be deemed terminated and without any further force, effect or obligation of either party to the other, except for those provisions which expressly survive the termination of this Agreement. If Purchaser does not elect to terminate this Agreement, then Purchaser shall purchase the Property, in which event at the Closing Seller shall assign to Purchaser all of Seller's right, title and interest in and to any claim Seller may have or award or settlement Seller may be entitled to receive in the condemnation proceedings and credit Purchaser with the amount of any condemnation proceeds theretofore paid to or on behalf of Seller.

13.2 If Purchaser purchases the Property as above provided and an award is rendered to or settlement reached by and paid to Seller before Closing, then the Purchase Price shall be reduced by the full amount thereof. Seller agrees to advise Purchaser in writing of any notice of taking or other notification of anticipated or pending condemnation proceedings promptly upon Seller's

receipt of same and further agrees to permit Purchaser to participate in any such condemnation proceeding as a "contract purchaser."

14. ASSIGNMENT; BINDING EFFECT. Without the prior written consent of Seller, Purchaser shall not, directly or indirectly, assign this Agreement or any of its rights hereunder. Any attempted assignment in violation hereof shall, at the election of Seller, be of no force or effect and shall constitute a default by Purchaser. This Agreement shall inure to the benefit of and shall be binding upon Purchaser and Seller and their respective heirs, successors and permitted assigns.

15. RECORDING. Neither this Agreement nor a memorandum or notice hereof may be recorded or filed by either party.

16. LIMITATION OF LIABILITY. Notwithstanding anything to the contrary in this Agreement, and subject to any additional limitations on Seller's liability set forth elsewhere in this Agreement: (a) Purchaser's recourse against Seller under this Agreement or any agreement, document, certificate or instrument delivered by Seller hereunder, or under any law, rule or regulation relating to the Property and the proceeds therefrom, shall be limited to Seller's interest in the Property; and (b) in no event shall any officer, director, shareholder, trustee, employee, agent, attorney or representative of Seller have any personal liability hereunder or otherwise. The acceptance of the deed and the entry of the Sale Approval Order shall constitute full performance of all of Seller's obligations hereunder other than those obligations of Seller, if any, that by the express terms hereof are to survive the Closing.

17. INTEGRATION; AMENDMENT; WAIVER. This Agreement constitutes the entire understanding of the Parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous understandings of the Parties with respect to the subject matter hereof, whether oral or written. This Agreement may not be amended, and no provision hereof may be waived, except in a writing signed by the Party to be charged thereby. A waiver in one instance shall not be construed to be a waiver in any other instance.

18. SURVIVAL OF REPRESENTATIONS. None of the terms and provisions of this Agreement shall survive the Closing unless such survival is specifically provided for herein.

19. COUNTERPARTS. This Agreement may be executed in any number of counterparts, all of which, taken together, shall constitute the original hereof. If separately executed counterparts of this Agreement or its signature page(s) have been executed by and delivered to all parties hereto, or their counsel, they shall have the same effect as if the signatures were all on the same copy hereof. Signatures to this Agreement, any amendment hereof and any notice given hereunder, transmitted by telecopy or .pdf shall be valid and effective to bind the Party so signing.

20. REAL ESTATE BROKER. The parties hereto agree and acknowledge that the only broker involved in the sale of this Property has been The Key Agency, who shall be compensated by the

Seller in accordance with a separate agreement between such broker and Seller. No other broker has been involved with the sale of this Property to Purchaser. In the event any claim is made against Seller by any other broker for a commission in connection with this sale, Purchaser agrees to indemnify the Seller and hold him harmless from any such claims made by such other broker.

21. INTENTIONALLY OMITTED

22. INTENTIONALLY OMITTED

23. BANKRUPTCY COURT APPROVAL; BANKRUPTCY COVENANTS.

23.1 <u>Sale Approval Order</u>. Notwithstanding anything to the contrary contained in this Agreement, the obligations of the parties under this Agreement are subject in all events to the entry by the Bankruptcy Court of an order approving the sale contemplated by this Agreement pursuant to the Bankruptcy Code and providing, among other things, that the conveyance to Purchaser shall, at Closing, be free and clear of all liens, claims, and encumbrances otherwise payable by Seller or Purchaser at the Closing other than the Permitted Exceptions and free of all transfer taxes (the "<u>Sale Approval Order</u>").

23.2 <u>Bid Procedures</u>. Seller shall use commercially reasonable efforts to obtain entry of a bidding procedures order ( the "Sale Procedures Order"), authorizing and approving bidding procedures (the "Bid Procedures"). Seller agrees that any bid at auction convened pursuant to the Sale Procedures Order must match the terms of this Agreement in all material respects, or be on more favorable terms and conditions to Seller, must be submitted in writing, must contain an agreement "redlined" against this document, must offer closing consideration of at least $25,000 more than the Purchase Price herein, must provide a good faith deposit of no less than $100,000 and must comply in all material respects with the Sales Procedures Order and the Bid Procedures.

24 GOVERNING LAW AND BANKRUPTCY COURT JURISDICTION. This Agreement, being drawn, negotiated and executed in the States of New York and New Jersey, but pertaining solely to property situated in the State of New Jersey, shall be interpreted and governed by the laws of the State of New Jersey without regard to the choice of law provisions of such State. This Agreement shall be construed without regard to or aid of canons requiring construction against the party drawing this Agreement. The Parties consent to the jurisdiction of the Bankruptcy Court to determine any claim, dispute or issues arising under or related to this Agreement, which jurisdiction shall be exclusive for so long as Seller is a debtor under the Bankruptcy Code. In all other cases, the Parties consent to the jurisdiction of any federal or state court located in the City, County and State of New Jersey.

[balance of page intentionally blank]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement on the day and year first written above.

The Estate of Dinaso & Sons Building Supply Company, [Inc.]:

By: _____

Name Greg Messer, solely in his capacity as

Chapter 7 Trustee and not individually


133 Ocean Avenue, LLC

By: _____

Name: Mayer Kessemen

Title: Mng. Member


Agreed to as to Section 4.3 and Section 9.3:

Robinson Brog Leinwand Greene

Genovese & Gluck P.C.

By: _____

Fred B Ringel

{00694579.DOCX;1}    20